UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:                                                          Chapter 11

1111 MYRTLE AVENUE GROUP LLC,                 Case No. 15-12454 (MKV)

                                        Debtor.
--------------------------------------------------------x

### MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF PREFERRED BANK FOR PAYMENT OF DEFAULT INTEREST AND LEGAL FEES AND EXPENSES, PURSUANT TO SECTION 506(b)

1111 Myrtle Avenue Group LLC (the "**Debtor**") respectfully submits this Memorandum of Law in opposition of the motion filed by the Debtor's secured creditor, Preferred Bank (the "**Lender**") seeking payment of post-petition default interest and various legal fees and expenses pursuant to Section 506(b) of the Bankruptcy Code [ECF #130] (the "**Motion**").

### PRELIMINARY STATEMENT

The Lender asks this Court to allow post-petition default interest at a range of 12.25% to 13.5%[1] in connection with a virtually no-risk loan, merely because the Debtor sought Chapter 11 relief in the face of an ill-motivated *lis pendens*. To be sure, the Debtor's estate is solvent, but the Lender's entitlement to post-petition default interest is not automatic under Section 506(b), particularly since there was no real risk of non-payment given the tremendous equity in the property which was largely leased by the Social Security Administration. Given these circumstances, any suggestion of risk is feigned at best.

---

[1] The total default interest aggregates $1,099,547.23 more than regular interest payments at 5.25%. This regular interest rate was fixed during the first year of the loan, and then was adjusted based on a non-default rate of 2 points over Prime, and a default rate of 9 points over Prime for a difference of 7 points. On the September 1, 2015 Petition Date, the Prime Rate was 3.25%, the non-default rate was 5.25%, and the default rate was 12.25%. During the Chapter 11 case, the Prime Rate increased several times to a final rate of 4.5% on December 14, 2017, which increased the default rate to 13.5% (4.5% + 2% + 7% = 13.5%).

1

As a threshold matter, it is important to note that neither the Lender nor the Lender's predecessor, United International Bank ("UIB"), issued a written notice of a non-monetary default as required by Section 13 of the underlying mortgage (quoted below) when the *lis pendens* was filed or the Debtor sought Chapter 11 relief. Without the requisite notice, the Debtor was never placed in default or given the opportunity to cure. In turn, the Lender's entitlement to post-petition default interest was not triggered.

Second, even if, *arguendo*, a notice of default was given, the Court still has discretion to invoke equitable considerations under Section 506(b) to deny default interest in appropriate circumstances. The Debtor submits that a number of equitable considerations come into play here to warrant disallowing post-petition default interest and a reduction of attorneys' fees.

As emphasized throughout the bankruptcy, the Debtor never once missed a pre-petition or post-petition mortgage payment, and was fully current under the mortgage when the bankruptcy was filed. As such, this case presents an atypical set of facts where the Chapter 11 did not involve monetary defaults or foreclosure, but rather was driven by the filing of a lawsuit by a defaulting contract purchaser, Myrtle Property Holdings LLC, ("**MPH**"), seeking to gain leverage by blocking the Debtor's ability to resell or refinance the property.

Given the successful result of the ensuing litigation against MPH in bankruptcy, the filing of the Chapter 11 did not harm the Lender's position in any measurable sense, since the Debtor continued to make debt service payments during the entire length of the Chapter 11 case.

The contention that the bankruptcy filing obligated the Lender to purportedly "downgrade the loan" and "increase its reserves" is not supported by any details, corroborating evidence, or reference to a specific statute, regulation or accounting standard. Moreover, the Debtor's research has not revealed any banking requirements imposing an automatic obligation

to establish additional reserves merely because a borrower is in Chapter 11, let alone without consideration of the underlying debt to value ratio or a long history of timely payments.

The summary and conclusory statements submitted by the Lender from Calvin Chan, Derrick Do, Alan Lefkowitz and William Sayre – which parrot each other –present questions of fact which need to be explored through discovery.

It is also noteworthy that Preferred Bank was not the original lender at the time of the Chapter 11 filing. It acquired the secured claim of UIB on or about November 20, 2015, following a banking transaction. *See,* Ambalu Declaration, Ex. "C". Thus, discovery is also needed to determine how the Debtor's loan was treated for purposes of Preferred Bank's acquisition of the stock of UIB, as well as Preferred Bank's relationship with the other participants in the loan. Moreover, the disparity of seven (7) points between the default rate and the non-default rate (5.25% vs. 12.25% as of the Petition Date) is of such a magnitude that discovery is needed to determine whether the default rate was designed to compensate the Lender for any actual risk attendant to the loan. If not, the default rate constitutes a penalty.

### *Ruskin v. Griffiths* Is Not Disabling

In seeking to recover default rate interest, the Lender relies heavily on the Second Circuit decision in *Ruskin v. Griffiths*, 269 F.2d 827 (2d. Cir. 1959). The Court in *Ruskin* gave effect to payment of a default rate of interest in bankruptcy for a solvent debtor in recognition of the risks and costs attendant to the debtor's default. *Id.*, at 833. The case is well traveled, and regularly cited on questions of default interest involving a solvent estate.

Notably, however, *Ruskin* was decided under the Bankruptcy Act following a formal declaration of a default and acceleration during a Chapter XI case.[2] In *Ruskin*, the Debtor was

---

[2] In *Ruskin*, the bankruptcy petition was filed in October, 1954. Following a forbearance agreement, the notice of default was issued on August 17, 1955, triggering the claim for default

subject to a post-petition forbearance which ended on July 18, 1955, leading to the issuance of the notice of default and acceleration. Here, there was no such notice given, and thus *Ruskin* is distinguishable as a factual matter due to the absence of notice. Substantively, the principles of *Ruskin* were carried forwarded under the Code in Section 506(b), which provides that an oversecured creditor is entitled to post-petition, or pendency interest. However, Congress did not impose a specific pendency interest rate to be applied in all cases under Section 506(b).

As case law has developed, courts have looked to *Ruskin* as establishing the contract default rate as a presumptive post-petition rate for oversecured creditors, which is subject to rebuttal if, among other things, equity demands denying post-petition default interest. *See, e.g., In re Milham*, 141 F.3d 420, 423 (2d Cir 1998); *In re Bownetree, LLC*, 2009 WL 2226107 (Bankr. E.D.N.Y. 2009). Accordingly, the Lender's repeated reference to *Ruskin* does not end the matter, but in realty serves as the starting point for the analysis in which the specific facts of this case must be considered.

## FACTS

### A. Background

Many of the relevant facts are set forth in the accompanying declaration of Aaron Ambalu (the "Ambalu Declaration"), which is incorporated herein by reference. Additional facts are set forth below.

The Debtor is the owner of commercial property located at 1103-1111 Myrtle Avenue, Brooklyn, New York (the "**Property**"), which has a value of $20 million or more.

Within a year prior to the bankruptcy filing, the Debtor and the Lender's predecessor, UIB, entered into a Mortgage Modification and Extension Agreement (the "**Mortgage**") and a

---

rate interest from that point forward. No default interest was allowed from the date of the bankruptcy petition to the date of the notice of default.

Second Amended and Restated Mortgage Note (the "**Note**") in the principal amount of $6,283,544.55, secured by a first mortgage lien against the Property. The modification extended the term of the Mortgage to January 1, 2020. Copies of the Note and Mortgage are annexed to the Ambalu Declaration as Exhibits "A" and "B", respectively.

The Note provided for an adjustable rate of interest and amortization based upon an initial rate of 5.5%. The Note also referenced a "Default Rate" without defining an Event of Default, stating:

> 10. If the principal sum outstanding shall remain unpaid after the Extended Maturity Date, or in the event that the Maker is in default under the terms of this Note or any document evidencing or securing this Note, then the interest payable thereon from and after the Extended Maturity Date or the date of default, whether before or after judgment, shall be at an annual rate of seven (7) percentage points above the rate of this Note at the Extended Maturity Date or date of default ("Default Rate"), but in no event greater than the maximum rate allowed by law.

See, Ambalu Declaration, Ex. "A".

By contrast, Section 13 of the Mortgage defined various events of default, including:

> (o) if at any time the Mortgagor . . . shall file . . . a petition for relief under the United States Bankruptcy Code . . .;

> (v) if Mortgagor shall fail to eliminate or secure any mechanics or other liens, easements, restrictions, encroachments, notices (including any *lis pendens)* or clouds upon title asserted against the Premises, by bonding or otherwise, within thirty (30) days of the date it becomes aware of same . . . .

The Mortgage also provided in Section "14", in relevant part, that:

> Remedies of Mortgagee. Upon the occurrence or happening of one or more Events of Default, Mortgagee may, in its sole discretion, in addition to all other rights and remedies available hereunder or available at law or in equity:

> (a) Declare the entire principal of the Note then outstanding (if not then due and payable), and all accrued and unpaid interest thereon, to be due and payable -immediately, and upon any such declaration, (i) all accrued and unpaid interest due under the Note, (ii) the outstanding principal of the Note, (iii) any prepayment premium due under the Note and (iv) any and all other charges required to be paid by Mortgagor pursuant to any provision of this Agreement, the

Note, or any other documents executed in connection herewith or any other document securing the Note shall become and be immediately due and payable, anything in the Note or in this Agreement to the contrary notwithstanding . . . .

*See,* Ambalu Declaration, <u>Ex.</u> "B".

At bottom, the Lender contends that it is entitled to Default Rate interest, *ipso facto*, as a result of filing of a *lis pendens* by MPH and the Chapter 11 petition filed by the Debtor since the Lender was oversecured and these events constitute Events of Default. The Lender makes this argument notwithstanding that it never issued a notice of default to the Debtor or accelerated the Mortgage, as required by the concluding part of Section 13 of the Mortgage (not referenced at all by the Lender), which provides that written notice and an opportunity to cure be given <u>before</u> a default can be validly declared:

> . . . in the event (i) a specific cure period for an event of default is not otherwise identified in this Section 13 and (ii) such default is a non-monetary default, Mortgagor shall be entitled to written notice of default and shall have thirty (30) days from the date of such notice within which to cure the default (the "Initial Grace Period"). If, however (a) such default cannot be cured within the Initial Grace Period; (b) Mortgagor has, during the Initial Grace Period, commenced and has diligently and continuously prosecuted its efforts to cure; and (c) prior to the expiry of the Initial Grace Period, Mortgagor has notified Mortgagee in writing of the results of its efforts to cure as well as the reason(s) and basis for such inability to cure within the Initial Grace Period, Mortgagor shall have an additional thirty (30) days from the last day of the Initial Grace Period within which Mortgagor shall continue to diligently and continuously prosecute cure to completion (the "Extended Grace Period").

*See,* Ambalu Declaration, <u>Ex.</u> "B".

Since no specific cure period was fixed in either Section 13(o) or (v)[3], and both the filing of the *lis pendens* and the filing of the Chapter 11 petition are non-monetary defaults, the Debtor

---

[3] The 30 day period referenced in Section 13(v) is not a specific cure period, but the waiting period before a notice of default can first be issued by the Lender. Once the thirty days pass, and the notice is issued, it would then be subject to a thirty (30) day cure period under Section 13, quoted above, since Section 13(v) does not otherwise contain a specific cure period. Any doubt as to this interpretation must be resolved against the Lender as the drafter of the Mortgage. *See, In re PBA Tour Gear, Inc.*, 301 B.R. 387, 398 -399 (Bankr. E.D.N.Y. 2003).

was entitled to prior written notice of default, failing which the invocation of default interest was not actually triggered.

## B. Litigation with MPH

On June 24, 2014, the Debtor, as seller, and MPH, as purchaser, entered into a Sale and Purchase Agreement (the "**Contract**"), to sell to the Property to MPH for $20.5 million, including a deposit of $7.5 million (collectively, the "**Deposit**").

The closing was adjourned and reset for June 30, 2015. MPH did not appear at the June 30, 2015 closing and the Debtor issued a letter to MPH on July 14, 2015 scheduling a time of the essence closing for July 28, 2015. The parties met on July 28, 2015 to conduct the closing, at which time the Debtor made a proper tender of title, as confirmed by the title company representative present at the closing. Conversely, MPH did not tender funds to close and was declared to be in default.

Notwithstanding its own default, MPH took steps to impede the disposition of the Property through the filing of a specious lawsuit for specific performance in the State Court (Index No. 509230/2015) replete with a notice of pendency on the morning of July 28, 2015.

Recognizing that MPH's agenda was to stymie the Debtor by a state court litigation, the Debtor commenced this Chapter 11 case on September 1, 2015 while the Debtor sought a determination from the Bankruptcy Court that MPH was in default.

On September, 25, 2015, the Debtor commenced an adversary proceeding seeking to enforce MPH's default under the Contract and to retain the Deposit as liquidated damages. MPH answered the Debtor's complaint, and asserted counterclaims alleging that the Debtor (not MPH) was in default. The matter was heavily litigated, with extensive discovery spanning many months and numerous Court appearances.

In advance of trial, the Debtor prepared a comprehensive pre-trial statement, memorandum of law, and voluminous evidence books. A two day trial was conducted on July 16, 2016 and July 17, 2016. Following extensive post-trial submissions, the Court issued a comprehensive decision (the "**Decision**"), finding that: (a) MPH "breached the Agreement by appearing at, but refusing to proceed with, the closing" and (b) the Debtor "is entitled to retain the $7.5 million contract deposit as liquidated damages pursuant to the Agreement."

As a result of this ruling, the funds comprising the Liquidated Damages Award of $7,500,000, together with the Debtor's other funds, including more than $2 million held by the Lender in a non-interest bearing reserve account, became available to fund a plan of reorganization.[4] The Plan was confirmed on April 3, 2018.

### C. The Lender's Claim in Bankruptcy

The litigation with MPH did not impede the Debtor's ability to pay and service the mortgage debt. More particularly, all pre-petition payment and collection arrangements were continued during the Chapter 11 case under a conventional Cash Collateral Stipulation and Order dated December 3, 2015[5] [ECF #17]. Of note, the Lender and its predecessor continued to collect rents directly from the tenants at the property (primarily GSA) which were paid into a lock box maintained by the Lender. Moreover, since the GSA was the Debtor's prime tenant at the Property, where it operated a Social Security Administration Office and paid monthly rent in

---

[4] The Lender provided no explanation as to why the Debtor apparently did not receive post-petition interest on more than $2.0 million, while the Lender demands default interest at between 12.25% - 13.5%.

[5] Under Paragraph 22 of the Cash Collateral Stipulation [ECF #17], the Debtor expressly reserved the right to "object to the payment of default interest, and any portion of the Lender's attorneys' fees and expenses that the Debtor, in good faith, believes are not reasonable". In turn, the Debtor agreed to pay monthly principal and interest at the non-default rate. Interestingly, the Lender, while reserving the right to seek default interest in Paragraph 22, never declared the Debtor in default before, in, or after the Cash Collateral Stipulation. Instead, Recital "G" the Debtor "alleges it was current with payments due under the Note and the Debtor intends to remain current with the payments due under the Note subsequent to the Petition Date".

an amount more than sufficient to cover all monthly interest, amortization, and real estate taxes, there was absolutely no risk of non-payment short of the demise of the Republic.

Notwithstanding the enviable position in which Preferred Bank found itself, namely being fully secured by more than a 3:1 ratio, with complete access to all of the rents, paid chiefly by the Federal Government, the Lender has filed four Declarations from representatives of Preferred Bank and its three participants, using virtually identical language to contend, in summary fashion, that the Lender was financially harmed by the Chapter 11 filing. These Declarants state as follows:

> The Debtor's bankruptcy filing, in and of itself, had adverse consequences for the Lender and the participating banks, by increasing the risk of non-payment and associated costs.

> For example, after the Petition Date, Lender downgraded the loan risk rating of the Mortgage. Specifically, the loan risk rating was downgraded by two levels, from "Pass" to "Special Mention."

> This downgrade resulted in the bank increasing its capital reserves for the Mortgage.

Other than these conclusory statements, no analysis is given as to why the risk of non-payment purportedly increased, and if so, by how much; why and under what basis the loan was downgraded; what was the significance of the downgrade from "Pass" to "Special Mention"; and to what extent the Lender increased its capital reserves. Additionally, the Lender gives no detail as to the relationship between the participating banks and whether the impact of the bankruptcy was the same for all four.

What we do know from reviewing counsel's time sheets is that the Lender's attorneys were busy at work researching entitlement to post-petition default interest and preparing a memorandum within the first two months of the Chapter 11 filing. In fact, some 34 hours was expended on this task alone in September and October 2015. The Lender's immediate focus on

post-petition default rate interest underscores that the perceived hardship now being claimed is self-created, and filters into the Debtor's view that the Lender was an opportunist looking for windfall profits on a fully performing loan.

The Debtor intends to serve a Rule 30(b) deposition notice and corresponding document request to flesh out all of these issues in greater detail. In the interim, the Debtor is submitting this Memorandum to develop the proper legal framework for determining the Motion.

## LEGAL ARGUMENT

## POINT I

### The Lender is Not Entitled to Default Rate Interest

In most bankruptcy cases, creditors are typically satisfied with obtaining repayment of their principal debt. In today's real estate market, entitlement to interest is much more common, bringing into play the Second Circuit's observation: "[i]n a bankruptcy case, interest is the tail of the dog, but it is a long tail and it wags a lot." *In re Milham, supra*, 141 F.3d at 421.

### A.    The Lender Never Properly Declared a Default

The first step to an award of post-petition default interest is that a default actually be declared under the Mortgage and Note. The Lender's failure to give proper, timely and conforming notice is a disabling factor which negates entitlement to post-petition default interest in bankruptcy.

The importance of proper and conforming notice was at the heart of the Bankruptcy Court's trial decision in *In re Sheba Realty Corp.*, 2014 WL 1373094 (Bankr. E.D.N.Y. 2014). There, the debtor successfully challenged default rate pendency interest on the basis of an improper acceleration of the debt. The Court found that unless and until it is established by a preponderance of the evidence that the lender provided proper notice of default as required by

10

the underlying mortgage, the lender is not entitled to pendency interest at the default rate and attorneys' fees:

> In summary, the Court finds that the Debtor did not have the required notice of monetary default until on or around June 29, 2010. The 2010 Cure Payments were more than sufficient to cover any arrearages existing at that point, and they were validly, duly, and properly tendered to Astoria within 10 days of the Debtor's receipt of proper notice. Therefore, Astoria never had, and ADHY does not now have, the right to compel the Debtor to pay default interest under the terms of the note and mortgage. Thus, ADHY's claim for default interest is disallowed entirely.

*Id.*, at *11. *See, also*, *In re Marcia Campbell*, 513 B.R. 846, 852 (Bankr. S.D.N.Y. 2014)(mortgagee was not entitled to pre-petition default interest because it "failed to establish the … date of acceleration, and it appears that [mortgagee] and its predecessors have not been forthright concerning the issue").

The same concepts and considerations govern here. As with the lenders in both *Sheba Realty* and *Marcia Campbell*, the Lender here never provided a proper notice of default, negating the Lender's entitlement to default interest since New York law imposes strict notice requirements. *See*, *Dale v. Industrial Ceramics, Inc.*, 571 N.Y.S.2d 185, 186 (Sup.Ct. NY Co. 1991)(denying judgment to plaintiff where notice was sent to incorrect address, holding that "In the law of negotiable instruments or bills and notes there are certain conditions such as agreed upon notice provisions which require strict compliance before courts will act . . . For the notice requirement is not merely some vestigial ceremonial remain, which evolved from medieval England to add luster to our legal system. It has a vital purpose); *In re St. Casimir Development Corp.*, 358 B.R. 24, 41 (S.D.N.Y. 2007)("New York law requires parties to strictly comply with a contract's notice provisions . . . Because the Removal Letter was not sent to the proper parties, it is void and of no effect"); *Cadlerock Joint Venture, L.P. v. Macpherson*, 2013 WL 4635832 *3 (Sup.Ct. NY Co. 2013)("When a party sends a default notice pursuant to the provisions of a

contract such as a note or mortgage, it must strictly comply with those provisions"); *see, also, Mfrs. & Traders Trust Co. v. Korngold*, 618 N. Y.S.2d 744, 745 (Sup. Ct. Rockland 1994)(plaintiff precluded from accelerating the mortgage based on failure to comply with the notice conditions of the mortgage); *Lapidus v. Kollel Avreichim Torah Veyirah*, 451 N.Y.S.2d 958, 959 (Sup.Ct. NY. Co. 1982)(holding that a request that future payments be made promptly is insufficient to constitute a notice of default).

In reviewing a similarly deficient purported notice of default in *In re 139-141 Owners Corp.*, 306 B.R. 763, 775 (Bankr. S.D.N.Y. 2004), *reversed in part on other grounds*, 313 B.R. 364 (S.D.N.Y. 2004), the Court explained that the junior lienor was not entitled to default interest because:

> GAMC's October 28 NOTICE OF DEFAULT did not comply with the requirements of paragraph 7 of the GAMC promissory note and, accordingly, was ineffective to trigger either a right of acceleration under paragraph 7 or a right to default rate interest under paragraph 11.

In view of the foregoing, the Lender's failure to issue a notice of default precludes any right to post-petition default interest.

## B.     The Default Rate is Subject to a Rebuttable Presumption of Reasonableness

As noted above, even if proper notice was given, the Lender's entitlement to post-petition default interest remains subject to equitable considerations.

The right to pendency interest under the Bankruptcy Code is governed by Section 506(b), which provides in relevant part that:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. §506(b).

The Supreme Court examined the scope of Section 506(b) in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S. Ct. 1026 (1989), which permitted payment of post-petition interest on an oversecured, nonconsensual tax lien. According to the Supreme Court:

> The phrase "interest on such claim" is set aside by commas, and separated from the reference to fees, costs, and charges by the conjunctive words "and any." As a result, the phrase "interest on such claim" stands independent of the language that follows. "[I]nterest on such claim" is not part of the list made up of "fees, costs, or charges," nor is it joined to the following clause so that the final "provided for under the agreement" modifies it as well. The language and punctuation Congress used cannot be read in any other way. By the plain language of the statute, the two types of recovery are distinct.

*Id.*, 489 U.S. at 241–42, 109 S. Ct. at 1030–31 (internal citations and footnotes omitted).

While the *Ron Pair* decision made clear that oversecured creditors are entitled to post-petition interest, the Supreme Court did not address which rate applies. In the years following, case law has developed to indicate that the contract default rate is a presumptive rate that is subject to adjustment by the Court based on "equitable considerations." *See, e.g. In re General Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011).

Courts have developed four factors to be analyzed in reviewing equitable considerations relating to post-petition pendency interest, including: (i) whether there was creditor misconduct, (ii) whether application of the default interest rate would cause harm to the unsecured creditors, (iii) whether the default interest rate constitutes a penalty, and (iv) whether imposition of the default interest rate would impair debtor's fresh start. *General Growth, Id.* at 328; *In re Vest Assoc.*, 217 B.R. 696 (Bankr. S.D.N.Y. 1998).

At first blush, these factors appear to help the Lender, since the Debtor retains a surplus. However, the Lender's conduct is far from pristine. It never declared a default, and has exaggerated the consequences of the Debtor's bankruptcy, loosely alleging inherent risks and

13

harm without any substantive proof or specific analysis. Moreover, the Lender retained control of the Debtor's funds in reserve throughout the case, apparently without paying interest, let alone interest anywhere near the rate which the Lender now seeks on a post-petition basis.

Misconduct can take many forms, and the Lender's apparent plotting to attempt to capitalize on the Debtor's need to invoke its statutory right to file Chapter 11 to free-up its Property fits under this rubric.

As to the penalty criteria, the question of allowability of interest under Section 506(b) turns on proportionality. A default rate that is significantly higher and disproportionate to the non-default rate is viewed with a healthy dose of skepticism in bankruptcy and treated as a penalty. *In re White*, 88 B.R. 498, 511 (Bankr. D.Mass. 1988)9("default rate at issue here is nothing more than a device (akin to a sledgehammer) to coerce the Debtors into prompt payment.") *In re General Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011)("there is a rebuttable presumption in favor of granting an oversecured creditor interest at the [default] rate specified in the contract, subject to equitable considerations").

Indeed, as the Second Circuit Court of Appeals pointed out in *In re Milham, supra*, 141 F.3d at 423 "Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread this practice may be, it does not reflect an entitlement to interest at the contractual rate".

## C.     Equity Favors Rejecting the Default Rate

### 1.     The Lender's Claim was Never at Risk

From day one when the mortgage was extended in 2014, the Lender was never in doubt about getting repaid. The Property itself was worth approximately $20 million, or more than

three times the amount of the approximately $6 million debt. Most mortgages have a loan to value ratio of 60-70%, not 30%.

Moreover, the prime tenant at the Property was, and remains, GSA, perhaps the most creditworthy tenant possible, which paid rents directly to the Lender's lock box in monthly amounts exceeding monthly debt service and taxes. While no loan is foolproof, this came as close as possible, as confirmed by the fact that the Debtor never missed a payment during the Chapter 11 case, and the Lender has been paid all undisputed amounts under the Plan. Given the absence of risk of non-payment, the default rate is disproportionately high.

Equally important, the Debtor comes to the analysis with clean hands, having never incurred a monetary default under the Note and Mortgage, or otherwise engaged in any bad faith conduct with respect to the Lender or its claim. The Chapter 11 filing was designed to free-up the Property from entanglements for the benefit of both the Debtor and the Lender. All of these factors distinguish this case from most of the decisions involving post-petition default interest by a non-paying borrower.

For example, in *In re Sultan Realty*, 2012 WL 6681845 (Bankr. S.D.N.Y. 2012), cited by the Lender, in sustaining default interest, the Court noted that the defaults in question included granting junior mortgage liens against the collateral aggregating $500,000 without the consent of the primary lender. The Court also cited the debtor's conduct during the year preceding the bankruptcy, when the debtor failed to make a single payment on time, tendered several checks that bounced upon presentment, and then stopped making payments altogether. Based on this conduct, which is entirely absent here, the Court found that the default rate reflected the risks to the lender.

Similarly, in *In re 139-141 Owners Corp.*, 313 B.R. 364 (S.D.N.Y. 2004), the District Court affirmed imposition of pendency interest at the default rate after focusing on the misconduct of a solvent debtor that intentionally stopped payment its mortgage and then tried to use the bankruptcy filing to avoid the default rate. Again, these facts are substantially different from those presented here, where the Debtor never engaged in any gamesmanship with the Lender, and the loan was never at risk of non-payment.

In comparison, the decision in *In re Bownetree, LLC*, 2009 WL 2226107, at *5 (Bankr. E.D.N.Y. 2009), is persuasive authority to deny default interest when the default involves commencement of a Chapter 11 case. After noting that the lender was paid the full amount of its bargain under the loan, the Court declined to impose default rate interest, stating "Any default on the part of the debtor was a technical default under the terms of the contract . . . Therefore, it would be inequitable to enforce the default rate under these circumstances."

For its part, the Lender cites to *In re General Growth Props., Inc., supra.*, where the Court permitted default interest based on a Chapter 11 filing. However, *General Growth* is readily distinguishable for two reasons. First, the parties there stipulated that the default rate under the contract of 3 points (as opposed to the 7 points here) was not a penalty. Second, the reorganization plan in *General Growth* provided for a cure and reinstatement of the subject mortgage under Section 1123(d). The Court found that Section 1123(d) specifically requires the amount of the cure to be determined "in accordance with the underlying agreement and applicable nonbankruptcy law" (*In re General Growth Props., Inc., supra,* 451 B.R. at 331). Section 1123(d) is different from Section 506(b), where the pendency rate of interest is guided by, but not always governed by, the underlying note. Both *In re 243rd St. Bronx R & R LLC*, 2013 WL 1187859 (Bankr. S.D.N.Y. 2013) and *In re Moshe*, 567 B.R. 438 (Bankr. E.D.N.Y.

2017), also cited by the Lender, contain similar holdings that the Section 1123(d) cure and reinstate provisions require payment of default interest under state law, and are likewise distinguishable on the ground that the Lender here was paid in full without reinstatement.

The proper resting stop for a decision on default interest "generally hinge[s] upon the question of whether the default rate compensates the creditor for any loss resulting from nonpayment or is in fact a disguised penalty." *In re Vest Assocs., supra*, 217 B.R. at 702. Similarly, even the decision in *In re 785 Partners LLC*, 470 B.R. 126, 136 (Bankr. S.D.N.Y 2012), noted that "the Default Rate of interest was designed to compensate the Original Lenders for the increased risk of non-payment and the costs associated with the Debtor's default".

Here, there was never any actual increased risk of non-payment as a result of the bankruptcy, notwithstanding the Lender's conclusory declarations claiming entitlement to the higher rate based upon the purported downgrading of the loan. These declarations are purely anecdotal, with no specifics as to the actual costs, if any, necessarily incurred by the Lender. Even if the monthly status reports by the Lender's counsel and the monthly meetings among the participants in the Lender's loan were warranted, the Lender has not provided any support that the costs of these reports and meetings is anywhere near the $1,099,000 in default rate interest the Lender now demands.

Further, during the Chapter 11 case, the Debtor continued making regular monthly payments of interest, amortization and taxes from rents paid by the U.S. Government directly to the Lender's lock box. In total, the Debtor paid more than $2,000,000 in total monthly debt service to the Lender during the Chapter 11 case (*See*, Ambalu Declaration, Ex. "E"), reducing the principal balance by over $570,000 through amortization, while remaining current on real

taxes, and accumulating more than $2 million in its lock box accounts (*See*, Ambalu Declaration, Ex. "D"). Given this history, the security of the loan is undeniable.

In this regard, the decision in *In re Kalian*, 178 B.R. 308 (Bankr. D.R.I. 1995) is highly instructive. There, the loan was current until the filing of the bankruptcy petition, and was paid in full following the sale of the Debtor's real property. The Court found that the loan was never at risk, negating the basis for the imposition of default rate interest even without post-petition payments:

> Fischer's claim to default interest fails because to honor it would be inimical to federal bankruptcy law's concern for the fair and equitable distribution of the debtor's assets.
>
> The time value of money lent has been paid to Fischer through the . . . interest rate. Fischer has not argued that the base rate has not been (at least) comparable to prevailing market rates at and following default. Although Fischer asserts that "a less creditworthy borrower must pay a premium to obtain the continued use of money," it must be remembered that the default here was a payment default triggered by bankruptcy. Throughout the course of Kalian's bankruptcy Fischer's collateral's value was protected and its claim was adequately protected by an equity cushion. Had the collateral been threatened, Fischer could have sought adequate protection or moved for relief from stay for cause. § 362(d)(1). There was never any cognizable risk that Fischer would go unpaid, or even underpaid.
>
> To the extent that default interest might be justified by the increased cost of administering and collecting a defaulted loan, it cannot be so justified here. In as much as it has requested them, and its agreement provides for them, Fischer will recover its *reasonable* 'fees, costs and charges.'

*Id.*, 178 B.R. at 316.

The same analysis should apply here as well, since the Lender cannot point to any cognizable risk that the loan would go unpaid.

### 2. The Disparity Between the Contract Rate and the Default Rate Is in the Nature of a Penalty

The Court in *In re Vest Assoc. supra*, held that a significant disparity is an important factor in determining the enforceability of a default rate holding that "[t]he presumption may be

rebutted if the rate is significantly higher without any justification offered for the spread or where the default rate appears inordinately high in relation to the non-default rate". *Id.* at 702.

Similarly, the Seventh Circuit Court of Appeals has instructed:

> Courts have found the presumption to be sufficiently rebutted in cases where the contract rate was significantly higher than the predefault rate without any justification offered for the spread. *Id.* For example, in *Consolidated Properties,* 152 B.R. at 458, the court refused to award interest based on a contract default rate which was thirty-six percent higher than the predefault rate where the contract already provided that the creditor would be entitled to late fees stemming from the debtor's default. A higher default rate of interest would have in effect enabled the creditor to recover twice for the same losses. In *Hollstrom* and in *DWS Investments,* contract default rates of thirty-six percent and twenty-five percent respectively were rejected because no evidence was presented to show that these rates were common in the market at the time of the transactions. *Hollstrom,* 133 B.R. at 539–40; *DWS Investments,* 121 B.R. at 850.

*Matter of Terry Ltd. P'ship*, 27 F.3d 241, 243–44 (7th Cir. 1994).

Accordingly, Courts have rejected the default rate as a penalty when there is a high differential between the contract rate and the default rate. *See, e.g., In re Kalian, supra*, (18% spread rejected); *In re The Boardwalk Partners*, 171 B.R. 87, 92 (Bankr. D.Az. 1994) (14.5% differential disallowed); *In re Hollstrom*, 133 B.R. 535, 537 n. 3–4 (Bankr. D.Col. 1991) (24% spread unreasonable); *In re DWS Investments*, 121 B.R. 845, 849 (Bankr. C.D.Calif. 1990) (10–11% differential not permitted).

The tipping point as between a permissible and unreasonable disparity in interest seems to be five (5) points, in line with the holdings in *In re 785 Partners, supra, and In re Vest Assoc., supra. See, In re Vanderveer Estate Holdings*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002)(Both the default rate of 12.56% and the differential of 5% between default and non-default rates in a solvent estate are within the range of reasonableness); *In re 243ʳᵈ Street Bronx R&R LLC*, 2013 WL 1187859 (Bankr. S.D.N.Y. 2013)(No assertion that five percent above 6.52% rate, for a total

of 11.52%, was a penalty); *In re General Growth Props., Inc., supra*, (parties stipulated that the 3% differential was not a penalty).

The two cases cited by the Lender where the Court fixed a default rate with a higher differential are both readily distinguishable. In *In re Liberty Warehouse Assoc. L.P.*, 220 B.R. 546, 552 (Bankr. S.D.N.Y. 1998), the Court accepted a default rate that was 8.8 points higher than the non-default rate, but noted that the debtor failed to provide "any legal or factual support regarding whether the default interest rate is unreasonable or unconscionable."

In *In re 20 Bayard Views LLC*, Case No. 09-50723 (Bankr. E.D.N.Y. Aug. 11, 2010), an unpublished Bench ruling, the Court accepted a 12-point differential based upon detailed testimony that the lender had suffered substantial harm in the form of lost revenue, reduced borrowing power, and lost opportunities to make other loans as a result of the debtor's pre-petition default in monthly debt service, and inability to pay more than half of the non-default rate during the Chapter 11 case, exacerbated by a post-petition maturity default. Thus, unlike the instant case where the Lender has made no showing that the $1,099,000 in default interest it seeks bears any relationship to the "harm" is alleges to have suffered, the lender in *20 Bayard* provide substantial evidence refuting the penalty nature of the default rate of interest.

## POINT II

### All of the Requested Legal Fees are Not Reasonable

To be sure, Section 506(b) permits the Lender to recover reasonable attorneys' fees as an oversecured creditor, as provided for in the agreement. Here the Note limits and qualifies recover of attorneys' fees in bankruptcy to collection activity. In pertinent part, Section 18 of the Note states as follows:

> If the Note is placed with an attorney for collection or if it is collected through any legal or equitable proceedings or through Probate or Bankruptcy Court, the

20

Maker shall pay the reasonable legal fees, together with all costs and expenses incurred in the collection of same together with interest thereon at the Default Rate through the date of payment, where or not formal legal action has been commenced.

Here, it is disputed whether the services were in the nature of collection. Indeed, it is debatable as to whether any of the services required collection since the Note was current at the time of bankruptcy, paid down monthly, and thereafter voluntarily satisfied by the Debtor under the Plan as to undisputed amounts.

For purposes of this Motion, the burden is on the Lender to establish that its fees are allowable under section 506(b), including that they are reasonable in the context of the case and authorized under the Note. *In re Canal Asphalt, Inc.*, 2017 WL 1956849, at *7 (Bankr. S.D.N.Y. 2017).

The Chapter 11 filing is a not an open invitation for the Lender to become overly paranoid, or for counsel to "over-lawyer" the case. In reviewing the reasonableness of a secured creditor's claim for legal fees under Section 506(b), "courts must also consider reasonableness within the general policies and provisions of the Bankruptcy Code, and bankruptcy courts have inherent discretion to review fee claims for potential abuse." *In re Glazier Group, Inc.*, 2013 WL 1856305, *3 (Bankr. S.D.N.Y. 2013).

While the standard has long been defined as "whether the creditor reasonably believed the services were necessary to protect its interest in the debtor's property", *In re PCH Assocs.*, 122 B.R. 181, 204 (Bankr. S.D.N.Y. 1990), it has also been held that:

> Secured creditors are not entitled to be reimbursed for fees incurred in every action taken by their counsel . . . It is unreasonable to seek reimbursement for fees that are not cost justified either by the economics of the situation or necessary to preservation of the creditor's interest in light of the legal issues involved. (internal citations omitted)

*In re Woods Auto Gallery, Inc.,* 379 B.R. 875, 884-885 (Bankr. W.D.Mo. 2007). As one Court cautioned, "creditors are entitled to engage counsel and pay for constant, comprehensive, and aggressive representation, but where services are not reasonably necessary or where action is taken because of an attorney's excessive caution or overzealous advocacy, courts have the right and the duty, in the exercise of their discretion, to disallow fees and costs under § 506(b)." *In re Wonder Corp. of America*, 72 B.R. 580, 591 (Bankr. D.Conn. 1987), *affirmed* 82 B.R. 186 (D.Conn. 1988).

Consistent with the terms of the Note, the necessity of the services must be geared to collection, and where, as here, the risk of non-payment is non-existent, the Court should not accept the fees as billed without a sound justification for the services performed. *See, e.g. In re Glazier Group, Inc., supra,* 2013 WL at *3 ("the reasonableness of counsel's activities in representing a secured creditor may depend on the extent to which the creditor's secured position is jeopardized . . . When there is only minimal risk, circumstances will generally require that counsel respond only to issues of material concern".)(Internal citations and quotation marks omitted); *In re Canal Asphalt, Inc., supra,* 2017 WL at *8 ("a secured creditor is not entitled to compensation for its attorneys' fees for every action it takes by claiming that its rights have been affected. Time billed for services not related to protecting the claimant's secured position is not allowed. The services employed have to be necessary to protect creditor's interest in the debtor's property. A secured creditor can recover only attorneys' fees which are incurred to achieve the objective of payment, or reasonably necessary to enforce a debtor's obligations to collect the amount remaining due pursuant to those obligations. Thus, where it is clear that the claimant is requesting fees that a typical secured creditor in its position would not have incurred to protect or

recover on its secured claim—for example, to acquire the collateral—such fees are not allowable under section 506(b).")(Internal citations and quotation marks omitted).

The Lender seeks to recover the sum of $79,758.25, representing over 225 hours of legal services, notwithstanding the fact that payment of the Note was never in doubt, and counsel's role in this case was largely one of monitoring the status on behalf of the Lender.

Indeed, other than commenting on two drafts of the cash collateral prepared by the Debtor's counsel, filing a four page objection to the Debtor's motion to distribute surplus funds received from GSA, and making sure that all of its disputed claims are reserve for following confirmation, the Lender has not taken a direct role in this case. Nonetheless, counsel managed to incur hundreds of hours of legal fees in what was largely a monitoring role.

As a case in point, during virtually every month a bill of at least $2,000 was generated to prepare a status report and submit a bill to the Debtor, regardless of whether the Lender was impacted by the events which transpired during the billing period. Monitoring of the bankruptcy case is not collection activity and is not compensable under the Note. In any event, it must be reasonable.

## CONCLUSION

Based upon the foregoing, the Debtor respectfully prays for the entry of an Order denying

the Lender's motion for pendency interest and reducing legal fees.

Dated:  New York, New York
      May 18, 2018

                           **GOLDBERG WEPRIN**
                           **FINKEL GOLDSTEIN LLP**
                           Attorneys for the Debtor
                           1501 Broadway – 22nd Floor
                           New York, New York 10036
                           (212) 221-5700


                           By:     /s/ Kevin J. Nash, Esq.

X:\GWFG\New Data\Yen\Word\1111 Myrtle Avenue\Objection To Preferred Bank Claim\Memo Of Law In Opposition To Lender's Motion Re Claim 05-18-18 v1.Docx

24