UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                        Chapter 11

   1111 MYRTLE AVENUE GROUP, LLC,            Case No. 15-12454 (MKV)

                        Debtor
--------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER GRANTING LENDER'S MOTION FOR PAYMENT OF DEFAULT INTEREST

*A P P E A R A N C E S:*

DAVIDOFF HUTCHER
& CITRON LLP
*Attorneys for Secured Creditor,*
*Preferred Bank f/k/a*
*United International Bank*
605 Third Avenue
New York, New York 10158
By:    David H. Wander, Esq. (agued)
       Taylor D. Kopelan, Esq.

GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
*Attorneys for the Debtor*
1501 Broadway, 22nd Floor
New York, New York 10036
By:    J. Ted Donovan, Esq.
       Kevin J. Nash, Esq. (argued)

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**

In this confirmed Chapter 11 case, Preferred Bank f/k/a United International Bank (the

"Lender") seeks payment by 1111 Myrtle Avenue Group, LLC (the "Debtor") of default interest

and legal fees and expenses, pursuant to the terms of a Mortgage Modification and Extension

Agreement (the "Mortgage Agreement" or "Mortgage") and a Restated Mortgage Note (the

"Mortgage Note" or "Note"), both dated December 30, 2014 (together, the "Loan Documents" or

"Documents").

On September 1, 2015, the Debtor filed a voluntary petition for relief under Chapter 11 of

the Bankruptcy Code.  ECF No. 1.  After entering judgment in favor of the Debtor in its

adversary proceeding for breach of contract against a purchaser under a real estate contract with

respect to property owned by the Debtor (Adversary Proceeding No. 15-01348 ("Adv. Pro."),

Dkt. No. 38), the Court confirmed the Debtor's Plan of Reorganization.  ECF No. 128.  One

week later, as contemplated by the Plan, the Lender filed a Motion to Allow Payment of Default

Interest and Legal Fees, pursuant to Section 506(b) of the Bankruptcy Code (the "Motion") [ECF

No. 130].[1]  In opposition to the Motion, the Debtor filed a Memorandum of Law (the "Debtor's

Memo") [ECF No. 142] and the manager of the Debtor filed a declaration attaching exhibits (the

"Ambalu Decl.") [ECF No. 141].  In response, the Lender filed a Reply Memorandum of Law

(the "Lender's Reply") [ECF No. 143] and counsel to the Lender filed a declaration [ECF No.

144].

The Court subsequently entered an Order Authorizing Depositions and Directing

Production of Documents [ECF No. 149], allowing the Debtor to obtain discovery from those

representatives of the Lender who had submitted declarations in support of the Motion on the

limited issue of whether the Debtor's bankruptcy filing had adverse consequences for the Lender

and participating banks.  *See* ECF No. 147.  Thereafter, the Debtor filed a Supplemental

Memorandum of Law ("Debtor's Supp. Memo") [ECF No. 155] addressing the evidence

---

[1] The Chapter 11 Plan explicitly provided that the "Debtor shall escrow sufficient funds to satisfy any award of default interest to the Lender based upon a 7% default rate above the contract rate . . ." and further specified that the "Lender shall serve and file a motion seeking the allowance of post-petition default interest and attorney's fees and expenses."  ECF No. 128 at ¶ 3, 5.

adduced during the limited discovery.  In response, the Lender filed a further Reply

Memorandum of Law ("Lender's Supp. Reply") [ECF No. 160].

Following oral argument on the Lender's Motion (the "Hearing"), the Court issued an

order (a) ruling that the Lender is entitled to payment of legal fees and expenses pursuant to the

Loan Documents in an amount to be determined and ordering Lender's counsel to submit an

amended application that better detailed the reasonableness of the requested fees and (b)

reserving decision on the default interest issue.  ECF No. 162.  After considering the merits of

each party's argument, the Court concludes that the Lender is entitled to payment of default

interest.  The portion of the Lender's Motion previously taken under submission is granted.

## BACKGROUND

**The Pre-Petition Loan**

On December 30, 2014, the Debtor and Lender executed the Loan Documents, including

the Mortgage Agreement [ECF No. 130, Exh. C at 1-12] and Mortgage Note [*id.* at 13-60],

pursuant to which the Lender agreed to loan the Debtor $6,283,544.55.  *See id.* at 7.  The loan

was secured by a first mortgage lien against certain commercial property located at 1123 Myrtle

Avenue, 1103 Myrtle Avenue and 1101 Myrtle Avenue, all in Brooklyn, New York (the

"Property").  *Id.* at 20.  At the time of filing, the Property had an estimated value of $20.5

million.  *See* Ambalu Decl. ¶ 7; ECF No. 1 at 6 ¶ 12 (Debtor's 1007 Declaration); ECF No. 117

(Debtor's Disclosure Statement), at 4.

The Note established a non-default interest rate of 2% over the highest prime rate as

published in the "Money Rates" column of The Wall Street Journal (the "Non-Default Rate").

ECF No. 130, Exh. C at 7-8.  The Note further provided that in the event of default, the

applicable interest rate would be raised to 7% above the Non-Default Rate (the "Default Rate"):

10.     If the principal sum outstanding shall remain unpaid after the Extended Maturity Date, or in the event that the Maker is in default under the terms of this Note or any document evidencing or securing this Note, then the interest payable thereon from and after the Extended Maturity Date or the date of default, where before or after judgment, shall be at an annual rate of seven (7) percentage points above the rate of this Note at the Extended Maturity date or date of default ("Default Rate"), but in no event greater than the maximum allowed by law.

ECF No. 130, Exh. C at 9.

The Mortgage similarly provides for payment of interest at a Default Rate of 7% above the Non-Default Rate in the event of default, and that such interest "shall be deemed a part of the Indebtedness and shall be secured by this Agreement . . . ."  *Id.* at 26 (Section 5).   Section 13 of the Mortgage contains a list of twenty-six events that constitute default, including:

(o) *if* by order of the court of competent jurisdiction, a trustee, receiver or liquidator of the Premises, or any part thereof, shall be appointed, or if at any time *the Mortgagor*, or any shareholder, partner or member of Mortgagor (if a corporation, partnership or limited liability company) or any maker, guarantor or surety of the Note, this Agreement or any other Loan Document, shall be insolvent, shall grant a general assignment for the benefit of creditors, shall be placed in receivership, *shall file* or have filed against it *a petition for relief under the United States Bankruptcy Code*, or shall be dissolved, or if the filing of any petition by or against the Mortgagor or maker, guarantor or surety of the Note, this Agreement or any other Loan Document with respect to any of the foregoing shall occur;

* * *

(v) *if Mortgagor shall fail to eliminate* or secure any mechanics or other liens, easements, restrictions, encroachments, *notices (including any lis pendens)* or clouds upon title *asserted against the Premises*, by bonding or otherwise, *within thirty (30) days of the date it becomes aware of same*;

*Id.* at 32-33 (the "Events of Default Provision") (emphasis added).   Section 13 continues:

[I]n the event (i) a specific cure period for an event of default is not otherwise identified in this Paragraph 13 and (ii) such default is a non-monetary default, Mortgagor shall be entitled to written notice of default and shall be given thirty (30) days from the date of such notice within which to cure the default (the "Initial Grace Period"). If, however, (a) such default cannot be cured within the Initial Grace Period; (b) Mortgagor has, during the Initial Grace Period, commenced and has diligently and continuously prosecuted  its efforts to cure; and (c) prior to the expiry of the Initial Grace Period, Mortgagor has notified Mortgagee in writing of the

4

results of its efforts to cure as well as the reason(s) and basis for such inability to
cure within the Initial Grace Period, Mortgagor shall have an additional thirty (30)
days from the last day of the Initial Grace Period within which Mortgagor shall
continue to diligently and continuously prosecute cure to completions. . . .

*Id.* at 34 (the "Grace Period Provision").

Section 14 of the Mortgage addresses remedies upon occurrence of default:

**Remedies of Mortgage**.    Upon the occurrence or happening of one or more
Events of Default, Mortgagee may, in its sole discretion, in addition to all other
rights and remedies available hereunder or availed at law or in equity:

(a)    Declare the entire principal of the Note then outstanding (if not then due
and payable), and all accrued and unpaid interest thereon, to be due and
payable immediately, and upon any such declaration, (i) all accrued and
unpaid interest due under the Note, (ii) the outstanding principal of the Note,
(iii) any prepayment premium due under the Note and (iv) any and all other
charges required to be paid by Mortgagor pursuant to any provision of this
Agreement, the Note, or any other documents executed in connection
herewith or any other document securing the Note shall become and be
immediately due and payable, anything in the Note or in this Agreement to
the contrary notwithstanding. . . .

*Id.* at 35.

**Bankruptcy and Post-Petition Actions**

Less than one year after executing the Loan Documents, the Debtor filed a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code.  ECF No. 1.  Thereafter, the Debtor

continued in possession of the Property and the management of its business as a debtor-in-

possession under Section 1107 of the Bankruptcy Code.  Pursuant to Section 13(o) of the

Mortgage, the Debtor's voluntary petition constituted an event of default.  At no point did the

Lender issue a written notice of default.

After this case was filed, the Debtor and the Lender negotiated a stipulation with respect

to the use of cash collateral, which was subsequently approved by the Court and entered as an

Order (A) Authorizing Debtor's Use of Cash Collateral, (B) Providing Adequate Protection, (C)

Scheduling Final Hearing, and (D) Granting Related Relief (the "Cash Collateral Stipulation")

[ECF No. 17].  Pursuant to the So-Ordered Stipulation, the Debtor agreed to, *inter alia*, pay

Lender's reasonable attorneys' fees and expenses as provided for in the Loan Documents, *id.* at

9, and to remit monthly mortgage payments to the Lender at the non-default rate of interest,

while preserving the Lender's right to seek payment of default interest later.  *Id.* at 10.  The

parties stipulated that the Debtor was current with the payments due under the Note as of the

Petition Date, and that the Debtor intended to remain current with payments due under the Note

following the Petition Date.  *Id.* at 2.  Additionally, the So-Ordered Stipulation specifically stated

that it did "not constitute a waiver of, expressly or implicitly . . . the allowance and payment

pursuant to Bankruptcy Code § 506(b) of default interest on [Lender's] Claim" and that "[t]he

Debtor reserves the right to object to the payment of default interest. . . ."  *Id.* at 14.

**The Adversary Proceeding Against Defaulted Purchaser**

Prior to the Petition Date, the Debtor had entered into a Sale and Purchase Agreement

(the "Sale Agreement") with Myrtle Property Holdings LLC ("MPH"), under which the Debtor

agreed to sell the Property to MPH for $20.5 million.  In connection with the Sale Agreement,

MPH paid a $7.5 million deposit (the "Deposit").  A time is of the essence closing was later

scheduled.  However, on the morning of the closing, MPH commenced a state court action

against the Debtor and also filed a *lis pendens* on the Property.  The filing of a *lis pendens* on the

Property constituted an event of default under Section 13(v) of the Mortgage.  ECF No 130, Exh.

C at 32-33; *see also* ECF No. 1 (Debtor's Rule 1007 Affidavit) at ¶ 27.  The Lender did not issue

a notice of default in response to the *lis pendens*.  MPH's state court action and *lis pendens*

precipitated the filing of this bankruptcy case.  ECF No. 1 (1007 Affidavit) at ¶¶ 5, 10.

After filing for bankruptcy, the Debtor commenced an adversary proceeding against

6

MPH for breach of the Sale Agreement. *See* Adv. Pro., Dkt. No. 1. In its complaint, the Debtor sought to retain the Deposit as liquidated damages pursuant to the terms of the Sales Agreement. *Id.* After a two-day trial on the Debtor's claim, the Court issued a Memorandum Opinion and Order finding in favor of the Debtor [Adv. Pro., Dkt. No. 38] holding that MPH was in default of its obligations under the Sales Agreement and, as a result, the Debtor was entitled to retain the $7,500,000 deposit as liquidated damages. Judgment was entered in favor of the Debtor [Adv. Pro., Dkt. No. 40] and the District Court subsequently affirmed the judgment. *See* Case No. 17-cv-8198 (AT), Dkt. No. 11 (S.D.N.Y. Aug. 13, 2018); Adv. Pro., Dkt. No. 62.

**Plan Confirmation**

After the Debtor's adversary proceeding was resolved, the Court entered an Order Confirming Debtor's Plan of Reorganization. ECF No. 128. Pursuant to the Plan, the loan was paid in full, together with interest calculated at the Non-Default Rate. Unsecured creditors received a cash dividend equal to 100% of their allowed claims totaling approximately $60,000. Equity holders retained their interest in the reorganized Debtor (including the Property valued at over $20 million) and received excess cash *pro rata*. The Plan specifically ordered that the Debtor escrow funds in anticipation of litigation regarding the default interest issue, which had been preserved in the Plan in accordance with the Cash Collateral Stipulation and Order. ECF No. 128 at ¶ 3. One week after the Plan was confirmed, the Lender brought this Motion for Payment of Default Interest and Legal Fees.

**DISCUSSION**

By this Motion, as contemplated in the Debtor's Chapter 11 Plan, the Lender seeks payment of default interest in the amount of $1,099,547.23, representing the accrual of post-

petition interest on the Note at the Default Rate of 7% above the Non-Default Rate.  Pursuant to

the Plan, interest at the Non-Default Rate was previously paid to the Lender, together with the

principal balance of $6,283,544.55.[2]

As a general rule, under equitable principles of insolvency law, interest ceases to accrue

once a bankruptcy filing occurs.  *Vanston Bondholders Protective Comm. v. Green*, 329 U.S.

156, 163 (1946).  In *Vanston*, the Supreme Court articulated three overarching reasons for this

rule: (1) in order to preserve and protect the estate for the benefit of all interests, the rule treats

post-petition interest as a penalty imposed for a delay of payment; (2) the rule avoids the

administrative inconvenience of continuously recomputing claims; and (3) the rule avoids the

gain or loss as between creditors whose obligations bear different interest rates or who receive

payment at different times.  *Id*. at 163–64.  This rule is currently codified in Section 502(b)(2) of

the Bankruptcy Code, which disallows a claim for unmatured interest.

However, the Supreme Court recognized an exception to the general rule against accrual

of post-petition interest and held that when a secured creditor is oversecured, it is entitled to

post-petition interest up to the value of its collateral.  *See Vanston*, 329 U.S. at 164 (citing *Coder*

*v. Arts*, 213 U.S. 223, 244 (1909)).  Codifying this exception, Section 506(b) of the Code states:

> To the extent that an allowed secured claim is secured by property the value of
> which, after any recovery under subsection (c) of this section, is greater than the
> amount of such claim, there shall be allowed to the holder of such claim, interest
> on such claim, and any reasonable fees, costs, or charges provided for under the
> agreement or State statute under which such claim arose.

---

[2] This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate). The Lender filed a secured claim against the Debtor regarding its mortgage, Proof of Claim No. 4-1, and this proceeding is to determine the amount of its entitlement under the claim. This proceeding falls squarely into the category of matters that "necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 564 U.S. 462, 499 (2011). The Bankruptcy Court is therefore able to enter a final judgment or order in this matter. *See, e.g., In re Windmill Run Assocs., Ltd*., 566 B.R. 396, 443 (Bankr. S.D. Tex. 2017); *In re Shree Mahalaxmi, Inc.*, 522 B.R. 899, 902 (Bankr. W.D. Tex. 2014).

While the accrual of interest is plainly allowed under Section 506(b), courts have held that in the case of default interest, the contract interest rate can be subject to adjustment based on equitable considerations. *See Matter of Southland Corp.*, 160 F.3d 1054, 1059-60 (5th Cir. 1998); *In re Terry Ltd. P'ship,* 27 F.3d 241, 243 (7th Cir. 1994); *see also In re Milham,* 141 F.3d 420, 423 (2d Cir. 1998); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 338 (S.D.N.Y. 2008); *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012); *In re General Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998). At the same time, courts recognize that "[t]he power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty." *785 Partners*, 470 B.R. at 134 (citing *Urban Communicators*, 394 B.R. at 338); *see also Gen. Growth*, 451 B.R. at 328; *In re P.G. Realty Co.*, 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998). The debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition. *Urban Communicators*, 394 B.R. at 338; *785 Partners LLC*, 470 B.R. at 134.

### I.     The Contract Allows for Payment of Default Interest in the Absence of Any Notice of Default

In its Motion, the Lender argues that there were two events that each independently triggered the Default Rate: the *lis pendens* and the Chapter 11 filing. According to the Lender, the Loan Documents provide that either would be a sufficient cause for the Lender to recover interest at the Default Rate. Hence, the Lender insists, there is a rebuttable presumption that it is

entitled to post-petition interest at the Default Rate pursuant to Section 506(b) of the Bankruptcy Code.

In response, the Debtor argues that the Lender's analysis glosses over a threshold issue in that the Lender failed to issue a notice of default, which the Debtor contends is required by the Grace Period Provision within Section 13 of the Mortgage. That provision mandates written notice and a "Grace Period" for default events that are (1) not assigned a specific cure period otherwise identified in Section 13 of the Mortgage and (2) are non-monetary defaults. ECF No. 130, Exh. C at 34. Without the written notice, the Debtor asserts, it was never "placed in default" or given the opportunity to cure, and therefore, the Lender's contractual entitlement to the Default Rate was not triggered.[3]

As an initial matter, the plain language of the Note contains no notice requirement and, by its terms, entitles the Lender to default interest if the borrower is in default under the Note or any other document securing the Note (*i.e.* the mortgage). The Debtor urges that the Court read a notice condition into the Note by incorporating into the Note the notice requirements from the Mortgage Grace Period Provision. Such an interpretation is unwarranted. "Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879 (N.Y. 2004).

---

[3] There can be no argument that the relevant provisions of the Loan Documents (deeming the filing of bankruptcy an event of default that triggered default) should be treated as an invalid *ipso facto* clause. An *ipso facto* clause is a clause in a contract or lease "that modif[ies] the relationship of contracting parties due to the filing of a bankruptcy petition." *In re AMR Corp.*, 730 F.3d 88, 105 (2d Cir. 2013) (quoting *In re Chateaugay Corp.*, 1993 WL 159969, at *4–5 (S.D.N.Y. May 10, 1993)). Although generally disfavored, such clauses are not *per se* invalid in the Second Circuit, except where contained in an executory contract or unexpired lease. *Id.* at 105-07. Many cases in this district have enforced similar default provisions contained within loan documents. *See, e.g., In re AMR Corp.*, 485 B.R. 279, 296 (Bankr. S.D.N.Y.), *aff'd*, 730 F.3d 88 (2d Cir. 2013); *Gen. Growth*, 451 B.R. at 331; *In re Saint Vincent's Catholic Med. Centers of New York*, 440 B.R. 587, 601–02 (Bankr. S.D.N.Y. 2010). This is especially true where, as here, the imposition of default interest will not impede the Debtor's "fresh start." *See Gen. Growth*, 451 B.R. at 331 (citing *Riggs Nat'l Bank v. Perry*, 729 F.2d 982, 984 (4th Cir. 1984)).

Section 13 of the Mortgage, which enumerates events of default and contains the Grace

Period Provision, is most reasonably read to require the Lender to provide notice of default and

opportunity to cure only before making use of the Remedies of Mortgagee described in Section

14 of the Mortgage, namely, the acceleration of debts.  *See In re Taddeo,* 685 F.2d 24, 26 (2d

Cir. 1982) ("When Congress empowered . . . debtors to 'cure defaults,' we think Congress

intended to allow mortgagors to 'de-accelerate' their mortgage and reinstate its original payment

schedule.").  In the context of the Mortgage, the cure period is meant to assuage concerns that the

Lender could otherwise make use of more drastic remedies without any notice of default, and not

for any reasons related to the imposition of default interest. [4]

While Section 13 of the Mortgage provides the Debtor the opportunity to cure a default,

this does not mean that the loan remains in good standing under the terms of the Note following

the event of default.  Default interest is triggered immediately upon the event of default, because

that event represents a shift in risk for repayment of the debt, which cannot subsequently be

"cured."  *See Anderson v. Hancock,* 820 F.3d 670, 676 (4th Cir. 2016) ("When debtors . . . miss

payments or otherwise default, they reveal an increased likelihood that secured creditors will

realize these risks. But just as statisticians update their probability estimates of a given outcome

whenever they receive new information . . . lenders may use default interest rates to increase risk

premiums whenever events reveal that their debtors may be riskier than the lenders might have

thought initially.").

---

[4] Indeed, several recent appellate decisions from other circuits have centered on the separate roles of default interest and acceleration as consequences of default in the context of the debtor's ability to "turn back the clock" pursuant to 1123(a)(5)(G) and 1322(b)(3), which authorize a Chapter 11 or 13 plan to "provide for curing or waiving any default." *See In re New Investments, Inc,* 840 F.3d 1137 (9th Cir. 2016); *Anderson v. Hancock,* 820 F.3d 670, 672 (4th Cir. 2016). Both courts ruled that while a debtor may utilize bankruptcy to cure a pre-petition default in order to de-accelerate the loan, a debtor is not entitled to "cure" the imposition of default interest following the default. The decisions underscore the notion that default interest functions parallel to other remedies of default.

On similar facts, other bankruptcy courts have found that the default interest terms of a note can function independently of the notice requirements under the mortgage.  *See, e.g., In re Bate Land & Timber, LLC*, 541 B.R. 601, 612 (Bankr. E.D.N.C. 2015), *aff'd*, 877 F.3d 188 (4th Cir. 2017) ("The Note provides that a default rate of interest of twelve percent 'shall' apply 'after default'. . . .  The Note does not contain language specifically requiring [Lender] to give notice in order for default interest to accrue, but does require notice to accelerate the unpaid principal and interest.").[5]

The Lender also argues that a default predicated on a bankruptcy filing in particular cannot be "cured" in any reasonable sense, and therefore, it would be absurd to conclude the Note and Mortgage require a notice of default and the right to cure since such notice would serve no practical purpose.  *See In re Jones*, 591 F.3d 308, 313 (4th Cir. 2010) ("[B]oth parties agree that the event that triggered default, the filing of a bankruptcy petition, cannot be cured. Therefore, we affirm the district court's holding that DaimlerChrysler was not required to give the Joneses notice of default and right to cure before repossessing the vehicle.").

The Court need not reach the issue of whether a bankruptcy petition, as a contractually defined event of default, can ever be "cured."  However, the particular facts of this case lead the Court to the same conclusion as the *Jones* court, that here "the requirement . . . to inform a debtor of his right to cure default is necessarily based on the premise that the default can be cured," *id.*, and that the Debtor's actions following bankruptcy effectively precluded any

---

[5] *In re Sheba Realty Corp*, 2014 WL 1373094 (Bankr. E.D.N.Y. Mar. 27, 2014), relied upon by the Debtor, is readily distinguishable.  There, the default interest provision clearly provided that "if there is a [non-monetary] default . . . *which default continues after any required notice to cure and such default has not been cured after any applicable grace period* then and after the date of such default the Borrower shall pay interest at the default rate. . . ." *Id.* at *6 (emphasis added).  The clause, on its face, undoubtedly required notice to cure before default interest could begin to accrue.  The opinion in no way contemplates whether notice of default or grace periods should be inferred in the absence such conspicuous and unambiguous language.

prospect of "curing" the filing of a bankruptcy petition.

Roughly two months after the petition date, the parties entered into the Cash Collateral Stipulation, which allowed the Debtor to use cash collateral to which the Lender had a secured interest under the Mortgage Agreement.  ECF No. 17.  The Cash Collateral Stipulation contained a provision titled "Rights Preserved" that stated that the Stipulation "is without prejudice to, and does not constitute a waiver of . . . any rights of the Lender . . . including, without limitation . . . the right to . . .  the allowance and payment pursuant to Bankruptcy Code § 506(b) of default interest on its claim."  *Id.* at ¶ 22.  The provision continued that "[t]he Debtor reserves the right to object to the payment of default interest."  *Id.*

Upon entering the Stipulation, both parties undoubtedly understood that the Lender intended to argue that it was entitled to receive interest at the Default Rate and that the Debtor intended to continue towards reorganization. That was the purpose of the Stipulation – to provide the Debtor with the necessary cash to continue functioning *during bankruptcy*, while at the same time preserving the rights to which the Lender was entitled, including specifically its claim for default interest.  *Id.*  The language of the Stipulation is also important; Paragraph 22 does not preserve the Lender's right to give notice of default, but rather preserves the Lender's right *to* default interest (along with the Debtor's right to object).  It would be unreasonable to conclude that the Debtor did not have constructive notice, at a minimum, of default at that juncture.  *See Suarez v. Ingalls,* 282 A.D.2d 599, 600, 723 N.Y.S.2d 380, 381 (2d Dep't 2001) ("Strict compliance with the contract notice provisions was not required because the plaintiff does not claim that she did not receive actual notice, or was prejudiced by the deviation.") (citing *Baker v. Norman,* 226 A.D.2d 301, 304, 643 N.Y.S.2d 30 (1st Dep't 1996));  *Schweizer v. Sikorsky Aircraft Corp.*, 2014 WL 5460504, at *6 (W.D.N.Y. Oct. 27, 2014), *aff'd*, 634 F. App'x 827 (2d

Cir. 2015) ("It is undisputed that Plaintiffs were involved in, and had knowledge of the course of

the [litigation actions] . . . Plaintiffs have not alleged any particular way in which they were

prejudiced, instead asserting tautologically that they were damaged because they 'did not receive

[the] written notice . . . which they had bargained for . . . .'").

Here, the Debtor benefited from the Lender's presumption, preserved in the Cash

Collateral Stipulation between the parties, that it would be entitled to default interest without

separately giving notice of default to pursue acceleration of the loan or other remedies of

default.[6]  *See In re General Growth Properties, Inc*., 2011 WL 2974305, at *3 (Bankr. S.D.N.Y.

July 20, 2011) ("The Debtors would penalize the [Lenders] for attempting to negotiate a

consensual resolution.").

As the Lender points out in its Reply, any notice of default, issued upon the Debtor's

filing of bankruptcy and for the purpose of triggering default interest, arguably would have

violated the automatic stay.  *See In re Manville Forest Prod. Corp*., 43 B.R. 293, 298 (Bankr.

S.D.N.Y. 1984), *aff'd in part, rev'd in part*, 60 B.R. 403 (S.D.N.Y. 1986) ("[A]ctions taken to

pursue prepetition claims during the pendency of a Chapter 11 proceeding are deemed void . . .

including the sending of notices of default or of acceleration."); *see also In re AMR Corp.*, 730

F.3d 88, 103 (2d Cir. 2013); *In re Solutia Inc.,* 379 B.R. 473, 484 (Bankr. S.D.N.Y. 2007).  Here,

where the Note on its face makes no mention of a notice to cure, it would be unreasonable to

transport the Grace Period Provision of the Mortgage into the terms of the Note, in effect

requiring the Lender to issue a post-petition notice of default (which would be void on arrival

---

[6] To the extent that the Debtor now claims a right to notice of default, its participation in the Cash Collateral
Stipulation effectively waived any such arguments.  *See Bank Leumi Tr. Co. of New York v. Block 3102 Corp*., 180
A.D.2d 588, 590, 580 N.Y.S.2d 299, 301 (1st Dep't 1992) ("[A] contracting party may orally waive enforcement of
a contract term notwithstanding a provision to the contrary in the agreement . . . [s]uch waiver may be evinced by
words or conduct . . . .").

and in violation of the stay) solely for the purpose of triggering a cure period (which is arguably

futile in the context of bankruptcy).  *See Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*,

2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015) ("[A] contract should not be interpreted to

produce a result that is absurd, commercially unreasonable or contrary to the reasonable

expectations of the parties.") (quoting *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d

413, 903 N.Y.S.2d 346, 346 (1st Dep't 2010)).

Even if the bankruptcy filing did not automatically trigger default interest, the filing of a

*lis pendens* by MPH and the Debtor's subsequent failure to remove the *lis pendens* within 30

days constituted an independent event of default that clearly did not require notice under Section

13(v) of the Mortgage.  Under the Grace Period Provision in Section 13 of the Mortgage, notice

is required only where a specific cure period for an event of default is not otherwise identified.

Subsection (v) of Section 13 clearly identifies a cure period for a default by reason of a *lis

pendens* filed upon property securing the loan.  ECF No. 130, Exh. C at 14 ("[I]f Mortgagor shall

fail to eliminate or secure any . . . notices (including any *lis pendens*) . . . within thirty (30) days

of the date it becomes aware of same.").  As such, the *lis pendens* default does not implicate any

notice requirements.

The Debtor argues without any support that this 30-day period "is not a specific cure

period, but the waiting period before a notice of default can first be issued."  ECF No. 142

(Debtor's Memo) at 6 n.3.  Such an interpretation would render the entire Grace Period Provision

meaningless.  Of the twenty-six subsections that enumerate events of default, seven include

specific timeframes that are rationally read as cure periods.  Each of those subsections, except

Subsection (a) discussing monetary default (which is expressly excluded from the Grace Period

Provision), are structured and phrased in a manner comparable to Subsection (v).  To

characterize the thirty-day period in Subsection (v) as a "waiting period" would excise any notion of a "cure period" from all other subsections. In such a case, the Grace Period Provision would apply to *all* non-monetary defaults, which contradicts the clear language and purpose of the provision.

The Court therefore concludes that the Lender is entitled to default interest starting from 30 days after the filing of the *lis pendens* on July 28, 2015.

## II.    Debtor Has Not Rebutted the Presumption that the Default Interest Provision Should be Enforced

While the Court has concluded that the Loan Documents entitle the Lender to default interest, there remains the issue of whether any countervailing equitable considerations justify a reduction in the amount of the contracted default interest rate. *See Urban Communicators*, 394 B.R. at 338; *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002); *Vest Assocs.*, 217 B.R. at 702. The debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition. *785 Partners*, 470 B.R. at 134.

On the facts and circumstances of this case, the Court does not find any equitable reasons to deviate from the contracted-for default rate. "The power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty." *Id*; *see also Terry Ltd. P'ship*, 27 F.3d at 243; *In re 243rd St. Bronx R & R LLC*, 2013 WL 1187859, at *2 n.2 (Bankr. S.D.N.Y. Mar. 21, 2013) ("Equitable factors considered in determining post-petition interest include whether (i) the debtor is solvent; (ii) the increased interest rate can be categorized as a penalty; (iii) the creditor engaged in misconduct; (iv)

payment of such rate would cause harm to other unsecured creditors; or (v) payment of the default rate would materially impair the debtor's fresh start.").

## A. The Default Interest is not a Penalty

"The Bankruptcy Code does not provide guidance regarding when a default interest rate will be deemed a penalty, and the issue should turn on applicable non-bankruptcy law." *785 Partners*, 470 B.R. at 135.  Under New York law, an interest rate that increases following a default is generally not characterized as a penalty.  *See Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) (citing *Union Estates Co. v. Adlon Const. Co.*, 221 N.Y. 183, 116 N.E. 984 (1917)); *785 Partners*, 470 B.R. at 131 ("It is well settled that an agreement to pay interest at a higher rate in the event of default or maturity is an agreement to pay interest and not a penalty.") (quoting *Jamaica Sav. Bank, FSB v. Ascot Owners, Inc.,* 245 A.D.2d 20, 665 N.Y.S.2d 858, 858 (1st Dep't 1997)).  Indeed, courts have noted that a higher default interest rate reflects the allocation of risk as part of the bargain struck between the parties, a bargain that benefits the obligor as well as the obligee.  *See Ruskin,* 269 F.2d at 832; *accord Citibank, N.A. v. Nyland (CF8) Ltd.,* 878 F.2d 620, 625 (2d Cir. 1989) ("[T]he Court observed [in *Ruskin*] that debtors might fare worse in the future if creditors were not allowed to impose variable rates, because creditors would then impose higher rates for the full life of the loan in order to reallocate the risk.").

The Debtor emphasizes that it made all required payments during the Chapter 11 Case, never incurred a monetary default under the Note and Mortgage, engaged in good faith with the Lender and its claim at all times, and paid the Lender all undisputed amounts under the Plan.  *See* ECF No. 142 (Debtor's Memo) at 14-18.  The Lender does not dispute this.  *See* ECF No. 160 (Lender's Supp. Reply) at 15.  The Debtor argues, therefore, that the Lender faced no real injury or risk and, as such, the Default Interest can be nothing other than a penalty.

The Court disagrees. "All higher default rates of interest have some penal effect in that they compel the timely compliance with the payment requirements under a loan agreement; if you default you pay more." *785 Partner*, 470 B.R. at 136. That there were *in fact* minimal or no monetary losses to the Lender does not retroactively render the interest unwarranted, because default interest serves future-looking purposes. *See id.* ("Debtor's arguments regarding the inequitable, unreasonable and penal nature of the Default Rate, and particularly, whether it covered the additional costs of administering a loan in default, is primarily based on hindsight."). To tie the legitimacy of default interest to questions of whether or not the contemplated risks actually materialized would defeat the very purpose of default interest provisions. An insured is not entitled to reimbursement on her premiums simply because she did not make use of the insurance. Such is the cost of risk.[7]

In *In re Residential Capital*, *LLC,* the court considered similar circumstances involving an oversecured creditor. 508 B.R. at 851. The court first acknowledged an out-of-circuit decision that had declined to award default interest, *In re Kalian,* 178 B.R. 308, 316 (Bankr. D.R.I. 1995) (denying default interest where oversecured creditor was adequately protected, and "[t]here was never any cognizable risk that [the creditor] would go unpaid"). However, the court nonetheless awarded default interest, even though equitable considerations weighed otherwise in that unsecured creditors would not be paid in full. Judge Glenn wrote that "the bargain that Citibank struck for assuming these risks, whether real or exaggerated, included interest at the

---

[7] For its part, the Lender forcefully asserts that there were, in fact, material consequences of the Debtor's bankruptcy, which, as discussed above, the Lender argues constituted an event of default even in the absence of any notice of default. *See* ECF No. 160 (Lender's Supp. Reply). According to the Lender, the bankruptcy triggered, albeit not automatically, a hike in the risk rating of the Loan [*id.* at 3-7], forced the Lender to dedicate additional resources to monitoring the Loan [*id.* at 10-12], and caused the Lender to increase capital reserves for the Loan [*id.* at 13]. The Court, however, need not address the merits or weight of these facts because it finds that the default interest provision is intended to compensate for prospective risks associated with default and does not depend on any actual incurred costs resulting from default.

contract default rate. The Debtors agreed, and not in a vacuum, but in the context of negotiations with many sophisticated parties . . . ." 508 B.R. at 861. The same is certainly true here as well. It would be unfair and inequitable to allow the Debtor to re-write the contract based on what actually occurred as opposed to the risks that were contemplated at time the contract was entered. *See Seidlitz v. Auerbach,* 230 N.Y. 167, 129 N.E. 461, 462 (N.Y. 1920) ("In determining whether the amount of the deposit is to be treated as liquidated damages or as a penalty, the agreement is to be interpreted as of its date, not as of its breach.").

The Debtor also argues that the Default Rate is facially a penalty because of the magnitude of the 7% differential between the Non-Default Rate rate and Default Rate. In this regard, cases in New York have found that a 5% differential between non-default and default rates falls well within the range of reasonableness. *785 Partners*, 470 B.R. at 135; *Vest Assocs.*, 217 B.R. at 703. Where, as here, creditors are repaid in full, courts have upheld substantially larger ranges between the default and non-default rates. *See In re Sultan Rea*lty, 2012 WL 6681845, at *7 (upholding a default rate of 24% over a non-default rate of 6.125% where, "while the default rate is about four times the non-default rate, it is nevertheless the presumptive rate, and [debtor] has failed to offer any evidence, beyond the size of the Default Rate itself, to rebut the presumption . . . [and] [m]ost important, [the debtor] is solvent, and the application of the default rate will not prejudice its creditors"); *Liberty Warehouse*, 220 B.R. at 552 (allowing a default rate interest of 22.8% and noting "the spread between the non-default and default rates of interest (*i.e.* 8.8%) is smaller than the differential present in most cases where courts have found the default rate to constitute a penalty"); *cf. Urban Communicators*, 394 B.R. at 341 (finding that the bankruptcy court erred in equitably reducing the award of interest from the contractual default rate of 38% down to 25%).

The Court finds that the Default Rate of 7% above the Non-Default Rate is not a penalty, even if the Lender was not harmed monetarily by the default. *785 Partners*, 470 B.R. at 136 ("In any event, [this] does not bind the Court or undercut the conclusion that the Default Rate of interest was designed to compensate the [lenders] for the increased risk of non-payment . . . .").

### B. Equitable Considerations Do Not Otherwise Support a Deviation from the Contracted Rate

Additional equitable considerations include whether (1) there has been creditor misconduct; (2) application of the contractual interest rate would cause harm to the unsecured creditors; and (3) application of the default interest rate would impair the debtor's fresh start. *Gen. Growth,* 451 B.R. at 328. The Court finds that there are no countervailing equitable considerations present on the facts of this case that would warrant varying the bargained-for contract rate. Indeed, the facts all support the opposite conclusion.

As mentioned above, the debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition. *785 Partners*, 470 B.R. at 134. In this case, the Debtor reaped the benefits of its decision to file for bankruptcy in that MPH's state court action was stayed and the Debtor ultimately prevailed in its adversary proceeding against MPH, entitling the Debtor to retain the $7.5 million purchase deposit as damages. The Debtor is solvent. Pursuant to the Debtor's Chapter 11 Plan, all unsecured creditors were paid in full. There is no evidence of misconduct on the part of the Lender. In short, the Debtor has failed to sustain its burden.

First, the imposition of default interest will not impair the Debtor's fresh start. Default Interest was allowed as a threshold matter because the Lender was oversecured; indeed, at all times the Debtor's equity in the Property exceeded the amount of the mortgage by a ratio of

20

more than a 3:1.  *See* Ambalu Decl. ¶ 7; Debtor's Memo at 9.  Pursuant to the Debtor's Chapter

11 Plan, the Debtor was able to pay off the entire mortgage and now owns the Property free and

clear of any liens.  In fact, this is a rare case where the Plan provided for distributions to equity

holders of the Debtor.  The Debtor's undiminished solvency, coupled with distributions to

equity, weighs against reducing the contracted Default Rate.  *See 785 Partners*, 470 B.R. at 134

("Reducing the contract interest payable by a solvent debtor would unfairly grant a windfall to its

equity."); *Gen. Growth*, 451 B.R. at 329 ("This reluctance is particularly evident in cases where

the debtor proves to be solvent."); *see also In re 139–141 Owners Corp.*, 313 B.R. 364, 369

(S.D.N.Y.  2004) ("[I]t would be inequitable and inappropriate to deny a creditor's right to

interest at the default rate, particularly where the debtor was solvent and knowingly bargained

for the terms of his contract."); *Urban Communicators*, 394 B.R. at 340 ("[I]t is not inequitable

to cut down the interest of Debtors' shareholders by interest payments at a default rate to which

Debtors contractually agreed.").

Second, there can be no suggestion that the application of the Default Rate would

prejudice the unsecured creditors, who were paid in full under the Plan.  *See Urban*

*Communicators*, 394 B.R. at 340, 342 (noting that "Debtors have failed to cite any case in which

a court has found an equitable basis for reducing a lawful contractual interest rate prescribed by a

contract where a debtor was able to pay all of its unsecured creditors" and ordering payment of

post-petition default interest at "the highest amount that still permits [the debtor] to repay its

unsecured creditors in full").

Lastly, the Court finds no misconduct by the Lender.  In the Debtor's filings, it insinuates

that the Lender's pursuit of default interest, in itself, constitutes some form of misconduct.  For

example, the Debtor asserts that the Lender "exaggerated the consequences of the Debtor's

bankruptcy," Debtor's Memo at 13, and its "focus on post-petition default rate interest underscores that the perceived hardship now being claimed is self-created, and filters into the Debtor's view that the Lender was an opportunist looking for windfall profits on a fully performing Loan." *Id.* at 9-10. The Court concludes that the Lender is fully within its rights in seeking to enforce the bargained-for interest rate.

In its supplemental briefing, which cites to depositions of representatives of the Lender, the Debtor essentially contends that the alleged "misconduct" amounts to general overstatements regarding the true extent of injuries sustained by the Lender as a result of the bankruptcy. *See, e.g.,* Debtor's Supp. Memo at 2 ("In their testimony, each bank representatives [sic] could not cite any aspect of the Chapter 11 case triggering actual risk of nonpayment or erosion of collateral."). This argument is not persuasive. The fact that the bankruptcy may not have caused the Lender pecuniary injury, even if true, is irrelevant. What is relevant – and dispositive, unless the Debtor rebuts the presumption – is that the risk which the default interest protected against came to pass. The Debtor fails to cite to any cases where a court found that that a lender's enforcement of a contractual remedy in the absence of financial injury was demonstrative of lender misconduct. Indeed, at the Hearing, counsel for the Debtor conceded that the Lender's actions in pursuing default interest fall into the category of strategy rather than misconduct.

In sum, the Court concludes that the contractual 7% Default Rate is not so egregious or inequitable that the Court must rewrite the Debtor and Lender's contract and apply a lower default rate of interest. The creditors have been repaid in full, equity retained cash, and the retained Property is worth more than $20 million. Indeed, the Court finds that the equities fully support enforcement of the parties' bargain and, as such, the Lender is entitled to receive interest at the contracted default rate.

## CONCLUSION

For the foregoing reasons, the Lender is entitled to payment of additional post-petition interest at the contractual Default Rate of 7% above the Non-Default Rate, in the total amount of $1,099,547.23.

**IT IS SO ORDERED**


Dated: New York, New York
        February 14, 2019

        _s/ Mary Kay Vyskocil_
        Honorable Mary Kay Vyskocil
        United States Bankruptcy Judge